IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


UNITED STATES OF AMERICA,                3:11-CR-00028-BR

        Plaintiff,

                                         OPINION AND ORDER

v.

RICHARD ROOSEVELT BAHR, JR.,

        Defendant.


**S. AMANDA MARSHALL**
United States Attorney
**GARY Y. SUSSMAN**
Assistant United States Attorney
1000 S.W. Third, Suite 600
Portland, OR  97204
(503) 727-1012

        Attorneys for Plaintiff

**STEVEN T. WAX**
Federal Public Defender
**THOMAS J. HESTER**
Assistant Federal Defender
101 S.W. Main Street
Suite 1700
Portland, OR  97201
(503) 326-2123

        Attorneys for Defendant


1 - OPINION AND ORDER

**BROWN, Judge.**

This matter comes before the Court on Defendant Richard Roosevelt Bahr's Motion (#26) to Suppress.  On April 23, 2012, the Court heard oral argument on Defendant's Motion, took evidence, directed the parties to provide the Court with further information, and took the matter under advisement.  For the reasons that follow, the Court **DENIES** Defendant's Motion.

## PROCEDURAL BACKGROUND

On January 26, 2011, Defendant was charged with two counts of Knowingly and Unlawfully Possessing Child Pornography in violation of 18 U.S.C. §§ 2252A(a)(5)(B), 2252A(b)(2), and 2253. On August 12, 2011, Defendant pled guilty to both counts of the Indictment.

On March 21, 2012, the Court held a sentencing hearing at which Defendant objected to the use at sentencing of statements made by Defendant during a May 2009 polygraph exam taken in the course of the state post-prison supervision term that followed Defendant's release from prison after a rape conviction.  The Court directed the parties to brief the issue.

On April 11, 2012, Defendant filed a Motion to Suppress in which he seeks an order suppressing statements from Defendant's May 2009 polygraph "upon which the Government's sentencing recommendation is partially predicated" on the ground that the

Fifth Amendment bars any consideration of those statements at sentencing.

On April 16, 2012, the government filed a Response in which it asserted (1) Defendant's polygraph statements were not the basis for the Presentencing Report (PSR) recommendation for a five-level guidelines enhancement pursuant to U.S.S.G. § 2G2.2(b)(5)(pattern of activity); (2) pursuant to the proper exercise of its sentencing authority, the Court could and should consider Defendant's statements in his May 2009 polygraph at sentencing; and (3) even if the Court did not consider Defendant's May 2009 polygraph statements, the Court should apply the five-level guidelines enhancement based on admissions that Defendant otherwise made to his mother about his sexual abuse and/or exploitation of minors.

On April 23, 2012, Defendant filed a Reply in which he also requested the Court to suppress the statements he made to his mother about his sexual abuse and/or exploitation of minors because Defendant made those statements to her only because "he was going to have to give a full disclosure regarding his victims [and . . . Defendant] wanted to make sure she could still support him knowing what he had done."

On April 23, 2012, the Court took testimony from Defendant's mother, heard oral argument on Defendant's Motion, directed the parties to provide the Court with further information, and took

3 - OPINION AND ORDER

these issues under advisement.  The Court continued Defendant's
sentencing hearing to June 5, 2012.


<u>**STANDARDS**</u>

Defendant seeks an order suppressing his statements made
during the May 2009 polygraph test and statements made to his
mother on the ground that consideration of those statements for
purposes of sentencing violates Defendant's rights under the
Fifth Amendment to the United States Constitution.

The Fifth Amendment provides in pertinent part that no
person "shall be compelled in any criminal case to be a witness
against himself."  U.S. Const. amend. V.  "It has long been held
that this prohibition not only permits a person to refuse to
testify against himself at a criminal trial in which he is a
defendant, but also 'privileges him not to answer official
questions put to him in any other proceeding, civil or criminal,
formal or informal, where the answers might incriminate him in
future criminal proceedings.'" *Minn. v. Murphy*, 465 U.S. 420,
426 (1984)(quoting *Lefkowitz v. Turley*, 414 U.S. 70, 77 (1973)).

> In all such proceedings, a witness protected by
> the privilege may rightfully refuse to answer
> unless and until he is protected at least against
> the use of his compelled answers and evidence
> derived therefrom in any subsequent criminal case
> in which he is a defendant. . . .  Absent such
> protection, if he is nevertheless compelled to
> answer, his answers are inadmissible against him
> in a later criminal prosecution.

*Id*. (quotation omitted).

In addition, "[a] defendant does not lose this protection by reason of his conviction of a crime; notwithstanding that a defendant is imprisoned or on probation at the time he makes incriminating statements, if those statements are compelled they are inadmissible in a subsequent trial for a crime other than that for which he has been convicted." *Id*. (citing *Baxter v. Palmigiano*, 425 U.S. 308, 316 (1976)).

In *Murphy* the defendant was questioned by police twice in 1974 concerning the rape and murder of a teenaged girl. No charges were brought. In 1980 the defendant pled guilty to a charge of false imprisonment related to criminal sexual conduct in an unrelated incident and was sentenced to 16 months imprisonment and three years probation. The terms of the defendant's probation required, among other things, that the defendant participate in a treatment program for sex offenders, report to his probation officer, and "be truthful with the probation office 'in all matters.'" *Id*. at 422. The defendant was advised that failure to comply with these conditions "could result in his return to the sentencing court for a probation revocation hearing." *Id*. In September 1981 a counselor at the sex-treatment program informed the defendant's probation officer that the defendant had admitted during the course of treatment to a rape and murder that occurred in 1974. The defendant's

5 - OPINION AND ORDER

probation officer set up a meeting with the defendant and decided beforehand that she would report to the authorities any incriminating statements made by the defendant during the meeting. *Id*. at 423.

At the meeting the probation officer advised the defendant about the information that she had received from the treatment-program counselor and expressed her belief that the information indicated the defendant's continued need for treatment. The defendant denied his false-imprisonment charge, admitted he had committed the 1974 rape and murder, and attempted to convince his probation officer that he did not need further treatment. At the conclusion of the meeting, the probation officer advised the defendant that she had a duty to report the information to the authorities. Two days later the defendant called his probation officer and told her that counsel had advised him not to surrender himself to the police. In response the probation officer "procured an issuance of an arrest and detention order." On October 29, 1981, a state grand jury returned an indictment against the defendant charging him with first-degree murder for the 1974 murder.

The defendant sought to suppress his confession on the ground that it was obtained in violation of his rights under the Fifth and Fourteenth Amendments. The Supreme Court concluded because the defendant

> revealed incriminating information instead of
> timely asserting his Fifth Amendment privilege,
> his disclosures were not compelled incriminations.
> Because he had not been compelled to incriminate
> himself, [the defendant] could not successfully
> invoke the privilege to prevent the information he
> volunteered to his probation officer from being
> used against him in a criminal prosecution.

*Id*. at 440.

The Court noted the self-incrimination privilege of the Fifth Amendment is generally not "self-executing." *Id*. at 429. Nevertheless, the Court recognized there are exceptions to that general rule; in particular, the "so-called 'penalty' cases" in which "the assertion of the privilege is penalized so as to 'foreclos[e] a free choice to remain silent and . . . compe[l] . . . incriminating testimony.'" *Id*. at 434 (quoting *Garner v. United States*, 424 U.S. at 661).

The defendant contended "[b]ecause revocation of his probation was threatened if he was untruthful with his probation officer, . . . he was compelled to make incriminating disclosures instead of claiming the privilege." *Id*. The Court found the defendant's assertion to be "unpersuasive" because

> [o]n its face, [the defendant's] probation
> condition proscribed only false statements; it
> said nothing about his freedom to decline to
> answer particular questions and certainly
> contained no suggestion that his probation was
> conditional on his waiving his Fifth Amendment
> privilege with respect to further criminal
> prosecution. . . . Yet [the defendant], although
> he had a right to do so . . . did not seek
> clarification of the condition. Without the
> benefit of an authoritative state-court

> construction of the condition, we are hesitant to
> read into the truthfulness requirement an
> additional obligation that [the defendant] refrain
> from raising legitimate objections to furnishing
> information that might lead to his conviction for
> another crime.

*Id.* at 437.  In addition, "there [was] no direct evidence that
[the defendant] confessed because he feared that his probation
would be revoked if he remained silent."  *Id.*

In 2002 the Supreme Court addressed the issue of the self-
incrimination privilege in the context of a prison sexual-abuse
treatment program.  *See McKune v. Lile*, 536 U.S. 24 (2002).  In
*McKune* prison officials ordered the defendant, a convicted sex
offender, to complete the prison's sexual-abuse treatment program
(SATP) before his release.  As part of the program participating
inmates were required to complete a sexual history form that
detailed all prior sexual activities even if such activities
constituted uncharged criminal offenses.  The SATP used a
polygraph examination to verify the accuracy and completeness of
the offender's sexual history.  *Id*. at 30.  The information
obtained from the form, however, was not privileged, and the
state left "open the possibility that new evidence might be used
against sex offenders in future criminal proceedings."  *Id*.  In
addition, state law required the SATP staff to report any
uncharged sexual offenses involving minors to law-enforcement
authorities.  Although there was not any evidence that
incriminating information was ever disclosed to authorities, the

8 - OPINION AND ORDER

release of information was a possibility.  *Id*.

Prison officials advised the defendant that his privilege status would be reduced from Level III to Level I if he refused to participate in the SATP.  As part of this reduction, the defendant's visitation rights, earnings, work opportunities, ability to send money to family, canteen expenditures, access to a personal television, and other privileges automatically would be curtailed.  In addition, the defendant would be transferred to a maximum-security unit where his movement would be more limited, he would be moved from a two-person to a four-person cell, and he would be in a potentially more dangerous environment.  *Id*.

The defendant refused to participate in the SATP on the ground that the required disclosures of his criminal history would violate his Fifth-Amendment privilege against self-incrimination, and he brought a § 1983 action against prison officials.  *Id*.  The Supreme Court held[1] the prison policy was not a compulsion under the Fifth Amendment, and, therefore, the policy did not violate the defendant's Fifth Amendment privilege against self-incrimination.  The Court concluded "the alterations in [the defendant's] prison conditions as a result of his failure

_____

[1] The Ninth Circuit has held Justice O'Connor's concurring opinion in *McKune* controls because there was "no single rationale explaining the result [that] enjoys the assent of five Justices" and Justice O'Connor's concurrence was "on the narrowest grounds."  *United States v. Antelope*, 395 F.3d 1128, 1133 n.1 (9th Cir. 2005).

to participate in the [SATP] were [not] so great as to constitute compulsion for the purposes of the Fifth Amendment privilege against self-incrimination." *Id*. at 48-49.

In 2005 the Ninth Circuit interpreted *Murphy* and *McKune* in two cases: *United States v. Antelope* and *United States v. Saechao*. In *Antelope* the defendant pled guilty to possessing child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B) and was sentenced to five years probation. 395 F.3d 1128, 1130 (9th Cir. 2005). One of the probation terms required the defendant to participate in the Sexual Abuse Behavior Evaluation and Recovery program (SABER), which would subject him to mandatory "periodic and random polygraph examinations." *Id*. at 1131. At sentencing the defendant raised a Fifth-Amendment challenge to the polygraph requirement, but the district judge concluded "use of that information . . . is, I think, subject to the privilege between the counselor and the patient." *Id*. The defendant appealed the district court's decision to the Ninth Circuit. While the appeal was pending, the district court revoked the defendant's probation for failure to comply with a number of conditions of probation, including the requirement that the defendant submit to polygraph examinations. *Id*. The district judge reimposed probation with an additional six months of electronic monitoring and warned the defendant that his continued refusal to submit to the polygraph would result in incarceration. *Id*. at 1132. The defendant

10 - OPINION AND ORDER

appealed that ruling as well.

While these appeals were pending, the district court again found the defendant in violation of probation. *Id.* At the probation revocation hearing, Roger Dowty, the defendant's counselor at the sex-treatment program, testified the defendant failed to complete SABER's sexual history autobiography assignment and "full disclosure polygraph" verifying his "full sexual history." *Id.* Dowty explained the defendant had been told any past criminal offenses that he revealed in the course of the program could be released to the authorities. *Id.* Dowty testified he was under a legal obligation to turn over information regarding offenses involving victims under eighteen. The defendant again asserted the polygraph requirement violated his Fifth Amendment rights, expressed his desire to continue treatment, and sought immunity for statements he made in compliance with the program. *Id.* The district court rejected the defendant's argument and sentenced him to 30 months in prison.

The defendant appealed a third time. *Id.* at 1132-33. On appeal the Ninth Circuit reversed in part and remanded for resentencing, but the court did not reach the defendant's Fifth Amendment claim. *Id.* at 1133. On remand the district court again imposed the contested conditions as terms of the defendant's supervised release. *Id.* The defendant once again

11 - OPINION AND ORDER

objected, but the court ruled the objection was not ripe.  *Id*.

The defendant appealed a fourth time.  While the fourth appeal was pending, the defendant finished serving his prison term and was released under supervision.  The defendant reasserted his desire for treatment, but he continued to refuse to reveal his full sexual history without an assurance of immunity.  *Id*.  At his release revocation hearing the defendant again asserted his Fifth Amendment argument, and the district court again found it unpersuasive.  *Id*.  The district court sentenced the defendant to an additional ten months imprisonment and 26 months of supervised release with the same conditions. *Id*.

The defendant appealed a fifth time.  *Id*.  On the fourth and fifth appeals, the Ninth Circuit held

> [b]ecause the government and district court have
> consistently refused to "recognize[ ] that the
> required answers may not be used in a criminal
> proceeding" against [the defendant], *Murphy*, 465
> U.S. at 435 n.7, we hold that the revocation of
> his probation and supervised release violated his
> Fifth Amendment right against self-incrimination.

*Id*. at 1139.  The Ninth Circuit reasoned the defendant's "risk of incrimination was real and appreciable" because "[t]he SABER program required [the defendant] to reveal his full sexual history, including all past sexual criminal offenses.  Any attempt to withhold information about past offenses would be stymied by the required complete autobiography and full

disclosure polygraph examination." *Id*. at 1135.  "The treatment condition placed [the defendant] at a crossroads - comply and incriminate himself or invoke his right against self-incrimination and be sent to prison." *Id*.  Accordingly, the Ninth Circuit concluded the defendant's "successful participation in SABER triggered a real danger of self-incrimination, not simply a remote or speculative threat." *Id*.  Dowty also explained at the probation violation hearing that he has reported his client's crimes in the past, and, unlike in *Murphy*, his reports have led to additional convictions.  *Id*.

With respect to the issue of compulsion, the Ninth Circuit in *Antelope* noted

> the controlling issue is the state's purpose in imposing the penalty:  Although it may be acceptable for the state to impose harsh penalties on defendants when it has legitimate reasons for doing so consistent with their conviction for their crimes of incarceration, it is a different thing to impose "penalties for the refusal to incriminate oneself that go beyond the criminal process and appear, starkly, as government attempts to compel testimony."

*Id*. at 1137 (quoting *McKune*, 536 U.S. at 53).  The Ninth Circuit recognized SABER's policy requiring convicted sex offenders to give a sexual history and to admit responsibility for past misconduct to participating counselors serves an important rehabilitative purpose.  Nevertheless, "[t]he irreconcilable constitutional problem . . . is that even though the disclosures sought here may serve a valid rehabilitative purpose, they also

13 - OPINION AND ORDER

may be starkly incriminating, and there is no disputing that the
government may seek to use such disclosures for prosecutorial
purposes." *Id*. at 1138.  In addition, the court noted Justice
O'Connor stated in *McKune* that she would not have found a
penalty of longer incarceration as imposed in *Antelope* to be
constitutionally permissible.  *Id.* (citing *McKune*, 536 U.S. at
52).  Accordingly, the Ninth Circuit held the defendant's
"privilege against self-incrimination was violated because [the
defendant] was sentenced to a longer prison term for refusing to
comply with SABER's disclosure requirements."  *Id*.

     In *Saechao* the Ninth Circuit examined the issue of self-
incrimination via a required polygraph examination in the context
of probation.  In that case the defendant pled guilty to a state
felony offense and was sentenced to state probation.  The
conditions of the defendant's probation included the requirement
that he "promptly and truthfully answer all reasonable inquiries
by the Department of Correction or County Community Correction
Agencies," and he was prohibited from possessing "weapons,
firearms, or dangerous animals."  The terms of his probation also
provided that failure to comply with any of the conditions was
grounds for arrest, revocation of probation, or modification of
conditions.  *Id*. at 1075.

     At a meeting with his probation officer, the defendant
revealed he had a 30.06 hunting rifle in the apartment that he

14 - OPINION AND ORDER

shared with his parents.  *Id*. at 1076.  The defendant's
possession of that firearm became illegal under 18 U.S.C.
§ 922(g)(1) after the defendant's state felony conviction.  The
defendant's probation officer confiscated the unloaded rifle from
the defendant's apartment.  *Id*.  The probation officer then
discussed the issue with his supervisor and decided "instead of
excusing [the defendant's] violation or even pursuing a
revocation of probation, they would turn the evidence over to
the federal authorities" to initiate prosecution for violation of
§ 922(g)(1).  *Id*.  Federal authorities arrested the defendant a
month later and charged him with violation of § 922(g)(1).  *Id*.

        The defendant moved to suppress the statements that he made
to his probation officer.  The district court granted the
defendant's motion on the ground that the defendant "did not have
free choice to refuse to answer questions about firearms
precisely because those questions related to a specific condition
of his probation," and, therefore, the defendant's statements
were "compelled" in violation of the Fifth Amendment to the
United States Constitution.  *Id*.  On appeal the Ninth Circuit
affirmed the district court and concluded "[b]ecause the state of
Oregon took the 'impermissible step' of 'requir[ing] [the
defendant] to choose between making incriminating statements and
jeopardizing his conditional liberty by remaining silent,' we
hold that [the defendant's] statements were compelled and

15 - OPINION AND ORDER

therefore inadmissible in the ensuing criminal prosecution."   *Id.*

The Ninth Circuit distinguished the facts of the defendant's parole with the facts in *Murphy* as follows:

> [The Supreme Court in *Murphy*] found that [the defendant's] admission was not compelled under threat of penalty because of the particular nature of his probation conditions.  The Supreme Court first found that [the defendant's] probation conditions did not actually require him to answer his probation officer's inquiry.  The Court noted that Murphy's conditions required him only to "be truthful with his probation officers in all matters," and did not impose any affirmative obligation to respond to his probation officer's questions:  "On its face, [the] probation condition proscribed only false statements; it said nothing about his freedom to decline to answer particular questions. . . ."  *Id*. at 436, 437, 104 S. Ct. 1136.  In light of the limitations of [the defendant's] probation condition, and the state's subsequent insistence that "it would not, and legally could not," on the basis of a "be truthful" condition, "revoke probation for refusing to answer questions calling for information that would incriminate in separate criminal proceedings," the Court concluded that [the defendant] could not have been objectively or subjectively "deterred from claiming the privilege by a reasonably perceived threat of revocation."
>
> Unlike in the case of *Murphy*, [the defendant here] was compelled by threat of penalty to answer the probation officer's inquiry about firearms.  The terms of his probation compelled him to answer "all reasonable inquiries."  The Oregon probation condition at issue was, thus, categorically different from the "be truthful" condition in *Murphy*.  Not only was [the defendant] required to be truthful to his probation officers, but he was expressly required, under penalty of revocation, to "promptly . . . answer all reasonable inquiries."  Contrary to the government's contentions, there is a significant difference between being required to be "truthful with . . . the probation officer in all matters," *Murphy*, 465

> U.S. at 422, 104 S. Ct. 1136 (internal quotation
> marks omitted), and being required to "promptly
> and truthfully answer all reasonable inquiries."
> Whereas the former "sa[ys] nothing about [a
> probationer's] freedom to decline to answer
> particular questions" and "proscribe[s] only false
> statements," the latter specifically penalizes a
> refusal to "answer particular questions." *Murphy*,
> 465 U.S. at 437, 104 S. Ct. 1136.  In contrast to
> Murphy, who the Supreme Court found was free to
> remain silent as long as he was truthful when he
> spoke, [the defendant here] did not have the
> luxury of remaining silent without violating the
> conditions of his probation.  Failure to answer a
> relevant inquiry regarding the conditions of
> probation would have justified the revocation of
> his probation.

*Id*. at 1078.

The Ninth Circuit also noted the government's argument ran "counter to the interpretation of Oregon's probation conditions by the Oregon state courts." *Id*. at 1079 (citing *State v. Gaither*, 196 Or. App. 131 (2004)).  The Ninth Circuit noted the Oregon Court of Appeals held in *Gaither* that statements elicited by a probation officer were "compelled" even though there was no express reference to the Fifth Amendment privilege in the probation conditions.  The Oregon Court of Appeals also held probation conditions that required the defendant to "promptly and truthfully answer all reasonable inquiries" and to "fully disclose his sexual history and provide a list of all . . . prior victims" gave the probationer an impermissible choice in violation of *Murphy. Id*. (quoting *Gaither*, 196 Or. App. at 137-38).

17 - OPINION AND ORDER

**FINDINGS OF FACT**

Based on the evidence presented at the April 23, 2012, hearing and the record as a whole, the Court finds the following facts by a preponderance of the evidence:

On August 14, 2003, Defendant was convicted of Rape in the Third Degree in Wasco County Circuit Court after Defendant, who was 19 years old at the time, began a sexual relationship with the victim when she was 13 years old.

Defendant received a six-year state prison sentence followed by a three-year term of post-prison supervision, including mandatory participation in sex-offender treatment. Defendant began his post-prison supervision on July 10, 2008, pursuant to which the State of Oregon Board of Parole and Post-Prison Supervision ordered Defendant to adhere to various "General Supervision Conditions," including, among other things: "Promptly and truthfully answer all reasonable inquiries by the Department of Corrections or a county community corrections agency." Add'l Exs., Ex. 1 at 3. Defendant was also required to participate in the following specific conditions of supervision:

> (f) Entry into and completion of or successful discharge from a sex offender treatment program approved by the board, supervisory authority or supervising officer. The offender shall abide by all rules and conditions of the sex offender treatment program. The program may include polygraph and plethysmograph testing. . . .
> (j) Participation in random polygraph examinations to obtain information for risk management and treatment. . . . The results of a polygraph

> examination under this subparagraph may not be
> used in evidence in a hearing to prove a violation
> of post-prison supervision.

Add'l Exs., Ex. 1 at 1-2.

At Defendant's initial intake interview on July 15, 2008, he expressed fear about taking the polygraph examination and "revealing all of the heinous sexual offenses he ha[d] committed in his younger years and the shame associated with having to discuss this information" with Probation Officer (PO) Dionne Justesen.

PO Justesen advised Defendant that he was required to participate in the polygraph examination; to reveal all of his victims; and, if the victims were identifiable, PO Justesen and Defendant would have to discuss whether prosecution would occur with the Wasco County District Attorney's Office.

PO Justesen also advised Defendant that "there are many ways to reveal his offenses that may not result in his prosecution" and that Defendant should discuss that issue with his sex-offender treatment provider.

Most clients of Defendant's treatment provider are concerned and anxious about the full-disclosure polygraph, and they worry about the possibility of being held criminally responsible for offenses they admit to during the polygraph examination. Defendant's treatment provider, therefore, assures her clients (including Defendant) that she has never seen anyone criminally

prosecuted for crimes they committed prior to treatment in the 11 years that she has been treating sex offenders.

Although Defendant failed two polygraph exams, he passed the third in May 2009 after revealing additional victims. According to PO Justesen, the additional victims "were not identifiable and therefore [were] not reported to the necessary agencies." Defendant has never been charged with any crime in connection with the victims revealed during the May 2009 polygraph examination.

Defendant's mother, Sandra Kay Brown, who testified at the April 23, 2012, hearing disclosed an interaction Defendant had with another child when Defendant was five years old and also described issues with Defendant generally. The Court finds Brown to be a credible witness and, therefore, credits her testimony as true.

In particular, the Court finds when Defendant was five years old, Brown learned from a neighbor that Defendant stuck his hand down the neighbor's daughter's pants and threatened to kill the daughter if she told anyone. In addition, Brown described instances when Defendant became violent with her on many occasions before he was 12, including stabbing holes in Brown's bedroom door, lighting things on fire inside the house, making a bomb and putting it under her bed, and threatening to burn down the house. On occasion Brown locked herself and her two girls in

the bedroom and put a chair in front of the door because it was
not safe being in the house with Defendant.  Brown feels
Defendant is a danger to himself and to others and "is a very
good liar."  In sum, as Defendant's mother, Brown made clear her
concerns that if Defendant is released he will molest other
children and might kill them to keep from getting caught.

Brown also related in July 2008, shortly after Defendant's
release on probation, Brown had conversations with Defendant
during which Defendant explained he needed to tell her some
terrible things he had done because he needed to know whether he
could "count on her" for support.  Brown did not perceive
Defendant felt any compulsion to tell her about these things;
instead, Brown thought Defendant was trying to enlist her aid in
his supervision.  Defendant then made various admissions to his
mother including:

When Defendant was eight years old he and other boys took
preschool boys into the woods and made them undress and have oral
sex with each other.

In 1999 when Defendant was 17 or 18 years old and
Defendant's cousin was 15 years old Defendant and his cousin used
methamphetamine and decided to have sex.  When Defendant
penetrated his cousin, however, his cousin objected but Defendant
did not stop.

At some point he gave his daughter muscle relaxers,

21 - OPINION AND ORDER

undressed her from the waist down, pulled her vagina apart, and masturbated.

At some point when Defendant was living on the streets in Portland and using heroin, he stayed at a homeless camp in which the parents took turns watching the children. Defendant "rubbed around" on the children who were young enough to climb up on his lap.

In the May 2009 polygraph examination that Defendant passed, he revealed twelve specific instances of sexual conduct with minors, five of which occurred when Defendant was a minor himself. Due to the quality of the record, some of these contacts are difficult to define. The Court, however, can discern the following:

When Defendant was 14 years old he (1) coerced a seven year old boy into anal sex seven times and (2) pulled down the panties of an eight year old girl and masturbated three times.

When Defendant was between the ages of 18 and 20 he remembers having sexual contact with eight to ten other teenaged girls who were all 15-16 years old.

Finally, when Defendant was 19 years old he (1) kissed the vagina of the 3 or 4 year old daughter of a woman he was seeing when he was changing the daughter's diaper, (2) put a two year old boy's penis in his mouth, (3) licked the vagina and rubbed his penis on the vagina of a four year old girl.

22 - OPINION AND ORDER

## CONCLUSIONS OF LAW

**1.   Information provided during Defendant's May 2009 polygraph examination.**

Defendant objects to the Court's consideration at sentencing

of any information gathered during his May 2009 polygraph

examination.  As noted, the conditions of Defendant's state

parole required Defendant to "[p]romptly and truthfully answer

all reasonable inquiries by the Department of Corrections or a

county community corrections agency."  In addition, Defendant was

required to participate in the following:

> (f) Entry into and completion of or successful
> discharge from a sex offender treatment program
> approved by the board, supervisory authority or
> supervising officer.  The offender shall abide by
> all rules and conditions of the sex offender
> treatment program.  The program may include
> polygraph and plethysmograph testing. . . .
> (j) Participation in random polygraph examinations
> to obtain information for risk management and
> treatment.

Add'l Exs., Ex. 1 at 1-2.  The requirement that Defendant

"[p]romptly and truthfully answer all reasonable inquiries" is

the same requirement as that set out in *Saechao*.  As noted, in

*Saechao* the Ninth Circuit concluded that requirement in

combination with the fact that the failure of the defendant to

comply with any of the conditions of parole would have been

grounds for arrest, revocation of probation, or modification of

conditions, created the situation in which "[the defendant's]

statements were compelled and therefore inadmissible in the ensuing criminal prosecution."  418 F.3d at 1076.

Here, however, the state conditions of parole and post-prison supervision appear to differ significantly from those in *Saechao*.  In particular, the conditions here provide "[t]he results of a polygraph examination under this subparagraph may not be used in evidence in a hearing to prove a violation of post-prison supervision."  Unlike in *Saechao*, ODOC is specifically prohibited from establishing that Defendant violated the terms of his probation on the basis of information revealed in the polygraph examination required to complete the sex-offender treatment program.  In addition, in contrast to *Antelope* and *Saechao,* Defendant's treatment provider advised him before he took the May 2009 polygraph examination that she had never seen anyone criminally prosecuted for crimes they committed prior to treatment in the 11 years that she has been treating sex offenders.

In sum, despite taking and passing the polygraph examination in which Defendant disclosed a number of additional, unidentifiable victims, Defendant has never been prosecuted for any additional crimes and the authorities were never contacted about Defendant's statements made in the May 2009 polygraph examination.  Also, unlike in *Antelope*, even though Defendant failed two previous polygraph examinations, his probation was not

24 - OPINION AND ORDER

revoked and he was not returned to prison or sentenced to additional time.

On this record the Court concludes as a matter of law that Defendant has not established "[t]he treatment condition placed [him] at a crossroads - comply and incriminate himself or invoke his right against self- incrimination and be sent to prison." *See Antelope*, 395 F.3d at 1135.  Accordingly, Defendant has not established successful participation in the polygraph examination required by the sex-offender treatment program triggered "a real danger of self-incrimination, not simply a remote or speculative threat."  *Id*.

The Court, therefore, denies Defendant's Motion to Suppress as to the use at sentencing of the information gathered during his May 2009 polygraph examination.

**2.    Statements made to Defendant's mother.**

Defendant also seeks to suppress the testimony of his mother, Sandra Kay Brown, regarding the information that Defendant provided to her in July 2008 about other minors he molested on the ground that he only told his mother about these things because he was going to have to reveal them in his polygraph examination.

Because the Court has already concluded it may consider at sentencing the information Defendant provided in his May 2009 polygraph examination, it follows that the Court may also

25 - OPINION AND ORDER

consider Brown's testimony regarding information that Defendant provided to his mother in July 2008 about other minors he molested (even if Defendant had made these disclosures to his mother only because he knew he was required to reveal them in the polygraph).  Moreover, Brown has independent, albeit second-hand knowledge of Defendant putting his hand down another child's pants when Defendant was five years old.  In addition, Brown has personal knowledge that Defendant has frightened her in the past, threatened violence, continued to scare her, and caused her to fear for her safety and the safety of others if he was released.

Accordingly, the Court denies Defendant's Motion to Suppress as to the statements he made to his mother during their July 2008 conversation related to events he was required to reveal in his May 2009 polygraph.

<u>**CONCLUSION**</u>

For these reasons, the Court **DENIES** Defendant's Motion (#26) to Suppress.

IT IS SO ORDERED.

DATED this 24th day of May, 2012.


/s/ Anna J. Brown
_____
ANNA J. BROWN
United States District Judge

26 - OPINION AND ORDER